IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED
IN OPEN COURT

JAN 9 2013

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) Criminal No. 2:12cr78 |
| HUFFMAN EARL MONK, | ) |
| Defendant. | ) |

## STATEMENT OF FACTS

By signing below, the parties and their respective counsel agree that the following facts are true and correct, and that had the matter gone to trial, the United States would have proven them beyond a reasonable doubt:

1.  The United States Coast Guard is part of the military transportation infrastructure organized under the Department of Defense Transportation Command (TRANSCOM). TRANSCOM maintains a computerized database of freight carriers and freight brokers used by military personnel to locate, negotiate, and enter into contracts with shipping companies, freight carriers, or brokerage companies (referred to collectively hereinafter as "shipping companies") for the shipment of military-related goods. This database is referred to as the Global Freight Management (GFM) system.

2.  From October 2009 to November 2011, the defendant HUFFMAN EARL MONK was the owner and operator of twelve shipping companies that were headquartered in a single office in Brookwood, Alabama, in the Northern District of Alabama. Many of MONK's freight brokerage companies contracted with TRANSCOM to ship military freight. During that same period, co-defendant NATHAN ALLEN DUNN was an active duty USCG Petty Officer, assigned as a Transportation Officer (TO) at the Surface Forces Logistics Center (SFLC) in

Norfolk, Virginia. DUNN was therefore a public official under 18 U.S.C. § 201(a)(1). DUNN's primary responsibility as a TO was to coordinate shipments of large USCG freight, such as boats, trailers, generators, motors, equipment, and other items between Coast Guard bases throughout the United States. In his capacity as a TO, DUNN was responsible for accessing the GFM system, inputting data associated with the shipment of freight – including freight type, origin, destination, weight, and other information – and then contracting with the shipping company who could satisfactorily complete the shipment for the lowest price.

3. After the shipping company had successfully completed a USCG freight shipment, DUNN's responsibility as a TO was to initiate payment to the shipping company. This was accomplished by submitting by wire a payment authorization to the main server of U.S. Bank, located in Minneapolis, Minnesota. U.S. Bank would then cause payment to be made to the shipping company by posting funds to the appropriate financial institution.

4. During the first nine months of his employment as a TO at SFLC, DUNN issued approximately ten contracts to a number of MONK's shipping companies. In September 2009, MONK made a trip to Norfolk, Virginia, to meet with the two Transportation Officers working at SFLC, including DUNN. Shortly after meeting one another, MONK corruptly began to make monetary payments to DUNN and, in exchange, DUNN began to award more freight contracts to MONK's companies. In February 2010, MONK and DUNN entered into an illicit agreement whereby MONK agreed to corruptly pay monetary bribes to DUNN, in exchange for DUNN awarding fraudulent and grossly overpriced contracts on USCG freight shipments to one of MONK's twelve shipping companies. The monetary amounts of the bribes MONK paid DUNN were based on the amount of profit MONK made on each contract DUNN awarded to one of MONK's shipping companies.

5. In furtherance of their agreement, DUNN manipulated the information he entered into the GFM system in order to award large, overpriced freight contracts to MONK's companies. For example, DUNN would artificially inflate the dimensions of the cargo to be shipped, include unnecessary charges for expediting the shipment, and manipulate the bid to include false charges for cargo that required specialized hauling equipment when no such equipment was needed. DUNN would also utilize a system override command in order to bypass hundreds of lower-cost carriers and award the contract to MONK. These artificial and fraudulent charges would result in a greater net profit for MONK.

6. DUNN would also create false shipping contracts for shipments that did not exist, and thereafter award the contracts to MONK. Because there was no freight actually being shipped pursuant to these false contracts, the payment made to MONK was total profit.

7. MONK paid bribes to DUNN in exchange for awarding contracts to MONK's companies in several different ways over a two year period. First, MONK provided DUNN with a COMDATA Network debit card which was funded by one of MONK's freight company bank accounts. DUNN was able to use this COMDATA card to withdraw cash at automated teller machines (ATMs). Second, MONK opened and deposited funds into an account at Secure First Credit Union (SFCU), in Brookwood, Alabama, to which DUNN had direct access via debit card. Finally, MONK and DUNN opened a joint bank account at RBC Bank entitled "BMT." BMT was the name chosen by MONK and DUNN for a shipping company they planned to open, but in fact existed only as a bank account. MONK and his spouse deposited money into the BMT account based on a percentage of the profit MONK made on the freight contracts DUNN awarded to MONK's companies. In this manner, MONK allowed DUNN to withdraw funds at

3

will from their joint BMT account with a credit/debit card, in the Eastern District of Virginia and elsewhere.

8. From on or about September 27, 2009 to on or about May 11, 2011, MONK and DUNN devised a scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations and promises to defraud the United States government. In advancing, furthering, and carrying out this scheme, DUNN and MONK transmitted signs, signals and sounds by means of wire communication in interstate commerce, or caused such transmissions to be made. Specifically, on or about November 9, 2010, DUNN created a false shipping contract on behalf of the USCG for $14,161.80 that he then awarded to Military Freight Haulers, Inc. – one of MONK's freight brokerage companies. From his office at the SFLC in Norfolk, Virginia, DUNN then transmitted a payment authorization for this shipment by wire to U.S. Bank in Minneapolis, Minnesota on November 10, 2010. This wire communication caused U.S. Bank to send a corresponding wire payment to the RBC Bank account of Military Freight Haulers, Inc., in Brookwood, Alabama, resulting in a net profit of $14,161.80 to MONK, despite the fact that no USCG freight had been shipped, as alleged in Count Sixteen of the indictment.

9. On or about March 7, 2011, HUFFMAN EARL MONK did directly and indirectly corruptly give a thing of value to a public official, as defined in 18 U.S.C. § 201(a)(1), namely, NATHAN ALAN DUNN, with the intent to influence DUNN to commit and to collude in the commission of fraud on the United States, that is, MONK caused the deposit of a $11,675.64 check from the Association of Government Transportation, Inc. (one of MONK's companies) into the BMT joint bank account of MONK and DUNN, from which DUNN later withdrew cash and made check card purchases totaling over $5,000 between March 8, 2011 and

March 31, 2011 in the Eastern District of Virginia, in exchange for DUNN using his position as a USCG Transportation Officer to agree to and fraudulently enter into overpriced freight contacts with MONK's freight brokerage companies, as alleged in Count Forty-Five of the indictment.

10. As a result of their illicit financial arrangements, and in exchange for awarding contracts to MONK's freight brokerage companies, MONK paid over $220,000.00 in bribes to DUNN between October 2009 and November 2011. As a result of DUNN and MONK's fraudulent, over-priced, and false freight contracts and transactions, the United States government suffered a financial loss of more than $400,000. *See* U.S.S.G. § 2B1.1(b)(1)(H).

11. The acts taken by MONK in furtherance of the offenses charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offenses charged in this case nor does it identify all of the persons with whom the defendant may have engaged in illegal activities.

NEIL H. MACBRIDE
UNITED STATES ATTORNEY

By: _____
Stephen W. Haynie
Assistant United States Attorney

_____
V. Kathleen Dougherty
Assistant United States Attorney

5

**Defendant's Signature:** After consulting with my attorney, and pursuant to the plea agreement entered into this day between the defendant, HUFFMAN EARL MONK, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt. My decision to enter into this stipulation is knowing, intelligent, and voluntary.

_____
HUFFMAN EARL MONK
Defendant


**Defense Counsel's Signature:** We are the attorneys for HUFFMAN EARL MONK. We have carefully reviewed the above Statement of Facts with him. To the best of our knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Adam M. Carroll
Counsel for the Defendant

_____
Stephen P. Pfeiffer
Counsel for the Defendant